UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAUNTE ROBERTSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 07 C 4398 |
| v. ) | |
| ) | Judge Rebecca R. Pallmeyer |
| THOMAS DART, as SHERIFF OF COOK ) | |
| COUNTY, et al., ) | |
| ) | |
| Defendants. ) | |

# DEFENDANTS' EXHIBIT

# A

Plaintiff's Deposition Excerpt

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3     SHAUNTE ROBERTSON,                    )
                                             )
 4                             Plaintiff,    )
                                             )
 5          vs.                              ) No. 07 CV 4398
                                             ) Judge Pallmeyer
 6     THOMAS DART, as SHERIFF OF COOK       )
       COUNTY, et al.,                       )
 7                                           )
                               Defendants.   )
 8

 9                       DEPOSITION OF:
                        SHAUNTAE ROBERTSON
10

11          The deposition of SHAUNTAE ROBERTSON,

12     called by the defendant for examination, pursuant to

13     notice, and pursuant to the Rules of Civil Procedure

14     for the United States District Courts, taken before

15     Christine M. Davidson, CSR in and for the County of

16     Will and State of Illinois, on May 16, 2008, at

17     10:56 a.m., at Stateville Correctional Center,

18     Joliet, Illinois.

19

20

21

22
                                                    EXHIBIT A
23

24
                                                            1
```

GEORGE E. RYDMAN & ASSOC., JOLIET, IL. (815) 727-4363

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

SHAUNTE ROBERTSON,              )
                                )
                    Plaintiff,  )
                                )
        vs.                     ) No. 07 CV 4398
                                ) Judge Pallmeyer
THOMAS DART, as SHERIFF OF COOK )
COUNTY, et al.,                 )
                                )
                    Defendants. )

                   DEPOSITION OF:
                  SHAUNTAE ROBERTSON

        The deposition of SHAUNTAE ROBERTSON,
called by the defendant for examination, pursuant to
notice, and pursuant to the Rules of Civil Procedure
for the United States District Courts, taken before
Christine M. Davidson, CSR in and for the County of
Will and State of Illinois, on May 16, 2008, at
10:56 a.m., at Stateville Correctional Center,
Joliet, Illinois.
```

Page 2

```
PRESENT:

    MONICO, PAVICH & SPEVACK
    BY MS. ANASTASIA X. PAVICH
    20 South Clark Street, Suite 700
    Chicago, Illinois  60603

        appeared on behalf of the plaintiff;

    ASSISTANT STATE'S ATTORNEY
    By MR. DANIEL J. FAHLGREN
    500 Richard J. Daley Center
    Chicago, Illinois  60602

        appeared on behalf of the defendants.


                    I N D E X
WITNESS
    SHAUNTAE ROBERTSON

EXAMINED BY                              PAGE
    MR. FAHLGREN                         3, 81
    MS. PAVICH                           79


                    EXHIBITS
ROBERTSON DEPOSITION                     PAGE
    No. 1                                60
    No. 2                                61
```

Page 3

MR. FAHLGREN: We're here at Stateville Correctional Center for the deposition of Shauntae Robertson, the plaintiff in this case. The deposition is being taken pursuant to notice and pursuant to the Federal Rules of Evidence and Federal Rules of Civil Procedure.

Present are Mr. Shauntae Robertson, his attorney, Anastasia Pavich, myself, Assistant State's Attorney Daniel Fahlgren, and the certified court reporter who is not in any way related to either party.

SHAUNTAE ROBERTSON, called as a witness on behalf of the plaintiff herein, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FAHLGREN:

Q  Mr. Robertson, you've just been sworn, correct?

A  Yes, sir.

Q  Have you ever given a deposition before?

A  No, sir.

Q  What we'll be doing here for the next probably couple of hours is I'll be asking you

Page 4

questions, asking you to answer truthfully to those questions. Do you understand that?

A  Yes, sir.

Q  Everything that you and I say or your attorney says during this deposition will be taken down, recorded, and eventually typed up by the court reporter. Do you understand that?

A  Yes, sir.

Q  Any transcript that's made of this testimony will be used at a trial in this case. Do you understand that?

A  Yes, sir.

Q  Because it's very noisy in here, I guess this next part is pretty important. If you don't understand or you don't hear my question, please let me know that and I'll rephrase it or ask another question. Okay?

A  Yes, sir.

Q  And for the reason that it's so noisy in here, we'll need both of us to keep our voices up nice and loud and make all of your answers in spoken words and not gestures or shakes the head.

Do you understand that?

A  Yes, sir.

Page 9

1  '02 to January of '06?
2     A  I was moved from Eleven for a fighting
3  ticket. I was moved from Eleven to Division 1 and
4  when I came from out of ABO, Division 1, I was moved
5  back to Eleven, sir.
6     Q  So you went from Division 11 to Division 1,
7  ABO?
8     A  Yes, sir.
9     Q  And how long were you in Division 1, ABO?
10    A  I believe three months, sir.
11    Q  And you said that it was for a fighting
12 ticket. What do you mean by that?
13    A  It was like some type of behavior program
14 they had over there, sir.
15    Q  And when you say a ticket, is that a
16 disciplinary charge that was brought against you?
17    A  Yes, sir.
18    Q  And that was for fighting?
19    A  Yes, sir.
20    Q  Was that for fighting with an officer or
21 another inmate or someone else?
22    A  Inmate, sir.
23    Q  Was that an inmate who had been in Division
24 11?

Page 10

1     A  Yes, sir.
2     Q  What was that person's name?
3     A  I can't remember, sir.
4     Q  Did he have a street name or nickname?
5     A  I don't remember, sir.
6     Q  When you were in Division 11 in January of
7  2006, what was the charge that was pending against
8  you?
9     A  First degree murder, sir.
10    Q  And do you know what security level
11 Division 1 was in January of '06? Was it medium,
12 maximum, minimum?
13    A  I believe minimum.
14    Q  It was minimum security, you believe?
15    A  Yeah.
16    Q  January 22, 2006, what tier were you housed
17 on in Division 11?
18    A  I was on AC, sir.
19    Q  At approximately 8:30 that evening, just
20 before the incident happened that's the subject of
21 your lawsuit, where were you?
22    A  I was in, I believe, upper 7, on the upper
23 deck, cell 7.
24    Q  And were you secured or locked in your cell

Page 11

1  at that time?
2     A  Yes, sir.
3     Q  Was there anybody else in the cell with you
4  at that time?
5     A  Yes, sir.
6     Q  Who was that?
7     A  My cellmate.
8     Q  Who was your cellmate?
9     A  Brian Lewis.
10    Q  And you described an incident involving an
11 officer named Trejo, T-r-e-j-o, correct, in your
12 lawsuit?
13    A  Yes, sir.
14    Q  Just shortly before that incident involving
15 Officer Trejo, what were you doing?
16    A  Sitting down playing casino, sir.
17    Q  Sitting down playing what?
18    A  Playing casino, sir, cards.
19    Q  Playing cards with Brian Lewis?
20    A  Yes, sir.
21    Q  And do you know what if anything was going
22 on in the tier at that time? Were there any inmates
23 to your knowledge out of their cell at that time?
24    A  No, sir. Not that I know of, sir.

Page 12

1     Q  To your knowledge, was everybody locked
2  into their cells?
3     A  Yes, sir.
4     Q  Was there a regular time in January of '06
5  when inmates were locked in their cells for the
6  evening or was it all day?
7     A  We was in protected custody, sir, so the
8  hours ran like all day like towards midnight shift.
9     Q  You were in protective custody? It was a
10 protective custody tier?
11    A  Yes.
12    Q  What does that mean? What do you
13 understand protective custody to be? Is it the same
14 as general population in the rest of the jail?
15    A  No, sir.
16    Q  What's different about it?
17    A  Supposed to be protected by correctional
18 officers from other inmates, I believe.
19    Q  Protecting you from other inmates?
20    A  Yeah.
21    Q  And in order to do that, were there rules
22 about when the inmates in Tier AC could be out of
23 their cells or when they had to be locked in?
24    A  Hours. It was getting ran by hours, sir,

Page 13

1  like one cell would come out at a time for an hour a
2  day.
3      Q  So, for example, on any particular day in
4  January of 2006 you were allowed out of your cell
5  and into the day room for one hour?
6      A  Yes, sir.
7      Q  What happened for the remaining 23 hours of
8  the day?
9      A  I mean, other cells be out for their hour,
10 sir.
11     Q  While inmates from other cells were out for
12 their hour, were you locked in your cell with Lewis?
13     A  Yes, sir.
14     Q  So it was a 23 hours in, one hour out
15 situation?
16     A  Yes, sir.
17     Q  Were you in that protective custody
18 situation from the time you came back to Division 11
19 after being in Division 1 but up until January of
20 2006?
21     A  No, sir.
22     Q  Can you describe for me, when did you start
23 being in protective custody?
24     A  I got stabbed, sir, like eight months

Page 14

1  before -- like eight months before this incident I
2  got stabbed, and I was in protective custody for the
3  time ever since to this incident happened.
4      Q  So you had been in protective custody for
5  about eight months when this incident with Trejo
6  happened?
7      A  Yes, sir.
8      Q  You said you were stabbed.  Was that in --
9  what division were you in when you were stabbed?
10     A  Eleven.
11     Q  Was that another inmate that stabbed you?
12     A  Some other inmates, yes, sir.
13     Q  Some other inmates?
14     A  Yes, sir.
15     Q  Were you injured in that stabbing?
16     A  Yes, sir.
17     Q  Did you spend some time in the hospital?
18     A  Yes, sir.
19     Q  Which hospital were you in?
20     A  Mount Sinai.
21     Q  How long were you in Mount Sinai after this
22 stabbing?
23     A  Two weeks.
24     Q  And after that two weeks, what happened?

Page 15

1      A  I went back to Eleven.
2      Q  And then you stayed in protective custody
3  up until at least January of '06?
4      A  Yes, sir.
5      Q  So I take it Brian Lewis was also in
6  protective custody?
7      A  Yes, sir.
8      Q  Do you know the names of any of the persons
9  that stabbed you?
10     A  No, sir.
11     Q  Do you know why Brian Lewis was in
12 protective custody?
13     A  No, sir.
14     Q  Now, let's talk about the incident that's
15 the subject of your lawsuit.
16        So you and Lewis were playing casino in the
17 cell?
18     A  Yes, sir.
19     Q  And that was approximately 8:30 or 9:00
20 o'clock in the evening, somewhere around that time?
21     A  I can't remember what time, sir.
22     Q  What is the first event that you recall
23 happening that involved this lawsuit?  What was the
24 first thing unusual that happened?

Page 16

1      A  I mean, I was playing cards with my celly
2  and the officer, Trejo, had came, opened up our
3  door, and we like, What's up, what's wrong, you
4  know?  He went off yelling, You all putting shit on
5  your door, you all putting bullshit in the door.  I
6  said, We ain't putting nothing in the door, man.
7  They must have popped it from the bubble.
8      Q  When you say they must have popped it from
9  the bubble, what are you referring to?
10     A  They got a treehouse that they -- the doors
11 over there in Division 11 is electronic doors so
12 they have to press a button from up top to enter
13 where the officers be at and the door come open.
14 That's how they roll all the doors and stuff.
15     Q  In Division 11 where you were, the officers
16 are able to from there -- is it like their office,
17 the bubble?  Is it like an office for the officers?
18     A  Yes, sir.
19     Q  And they're able to open the cells
20 electronically from their bubble?
21     A  Yes, sir.
22     Q  And you said Trejo -- before we get to
23 that, before this incident happened with Trejo, had
24 you already had your one hour out for that day?

Page 17

1  A  I believe so.
2  Q  So when Trejo came to your cell, you didn't
3  expect that to be your hour out?
4  A  No, sir.
5  Q  Did Trejo -- you said he started yelling at
6  you when he came in the cell?
7  A  Yes, sir.
8  Q  Did he say you particularly or was he
9  yelling at Lewis, could you tell?
10 A  Both of us.
11 Q  What specifically was he yelling about?
12 A  Saying we putting shit in the door. That's
13 what he was saying. Why you all putting this
14 bullshit in the doorway. I mean, like I can't
15 remember like word for word what he was saying, but
16 I know it was a lot of hostility in his tone and he
17 was using bad language. He called me the N word,
18 nigger, and I called him a couple of words like
19 faggot, and, you know, stuff like that. He left.
20 He left and he came back with officers.
21 Q  Let's go back here a little bit. So Trejo
22 comes in. Does he actually come inside the cell?
23 A  No. He stayed on the outside of the cell.
24 Q  Was the cell door closed or open at that

Page 18

1  time?
2  A  It was open.
3  Q  It was open but he was on the outside of
4  the door?
5  A  Yes, sir.
6  Q  After he initially yelled at you, and then
7  you said some things back to him, right?
8  A  Yes, sir.
9  Q  Was there any physical contact between you
10 and Trejo at that time?
11 A  No, sir.
12 Q  Did he or anyone else close the door?
13 A  Yeah. He closed the door and he left, sir.
14 Q  So he closed the door and then he went away
15 from your cell?
16 A  Yes, sir.
17 Q  You said that he said to you something
18 about putting stuff -- I think you used the word
19 shit in the door?
20 A  That's what he said.
21 Q  He said you were putting shit in the door?
22 A  Yes.
23 Q  Did you understand what he was referring
24 to?

Page 19

1  A  Yeah.
2  Q  What's that?
3  A  He thought like I was putting something in
4  the door so I could come up out of my cell and run
5  around in the day room or whatever.
6  Q  Did you understand him to be yelling
7  about -- accusing you of somehow putting something
8  in the door to keep it from locking?
9  A  Yes.
10 Q  He yelled at you and you yelled some things
11 back at him, right?
12 A  Yes, sir.
13 Q  Was Lewis yelling also?
14 A  No, sir.
15 Q  Did he close the door, do you know, or did
16 the door close by itself?
17 A  He closed the door.
18 Q  So we're clear, is this a door that slides
19 from side to side to close?
20 A  Yes, sir, it would slide.
21 Q  So it doesn't swing open like the door
22 that's here on hinges?
23 A  No, sir.
24 Q  It's a sliding door?

Page 20

1  A  Yes, sir.
2  Q  When he walked away from the door then, was
3  the door slid back shut?
4  A  Yes, sir.
5  Q  Did you check it to see if it was actually
6  locked?
7  A  No, sir. I knew it was locked.
8  Q  What was the next thing that happened?
9  A  The next thing he left. He came back like
10 some minutes later. I can't remember like how many
11 minutes, but it wasn't that long. He came back.
12 When he came back he told me that the chief and the
13 captain wanted to speak to me, wanted to talk to me.
14    I said -- I looked, I got up, then I
15 thought about it because I seen some more officers
16 on the outside of the door like in the innerlock and
17 they had on their gloves, and I know these officers,
18 I'm familiar with they work and how they be doing
19 around the cellhouse, the deck.
20    So I'm like, Where the white shirt at, you
21 know? I'm like, You got to give me a white shirt.
22 That's a sergeant that wear a white shirt. That's
23 what we call them, white shirt.
24    So I'm like, Where the white shirt or the

Page 25

1  Q  Did Trejo have gloves on?
2  A  I don't remember, sir.
3  Q  The gloves that you saw these other
4  officers wearing, can you describe the gloves?
5  A  I mean, just gloves. I mean, I can't --
6  that's what they do, you know. They wear gloves any
7  time they --
8  Q  Are they like surgical gloves, like white
9  rubber gloves?
10  A  No. They black gloves.
11  Q  Looked sort of like something somebody
12  might wear in the wintertime to keep their hands
13  warm gloves or rubber gloves? You can't tell?
14  A  Like motorcycle gloves or something.
15  Q  Possibly leather or vinyl black gloves?
16  A  I just know they was black.
17  Q  Did you know Trejo before that day?
18  A  I mean, I seen him. I seen him around a
19  couple of times.
20  Q  Was he an officer you had previously seen
21  on that tier working?
22  A  He worked over there a few times, yeah.
23  Q  Did you ever have any arguments or problems
24  with Trejo before that day?

Page 26

1  A  No, sir. That was the first time.
2  Q  What happened when he came up to the cell
3  the second time when you saw the officers in the
4  innerlock behind him? What did Trejo do?
5  A  He said the chief and the captain want to
6  talk to you.
7  Q  I'm sorry. You told me that. And you told
8  him you wanted to see a white shirt.
9  A  Exactly. I say, Why can't somebody with
10  some higher authority come and tell me that, you
11  know, like a lieutenant or a sergeant or something,
12  a white shirt.
13  Q  After you said that, what did you do?
14  A  I just told him I ain't going nowhere until
15  a sergeant -- a higher authority come and tell me
16  that.
17  Q  You were telling him that you weren't going
18  to come out of the cell with him, you wanted a white
19  shirt in authority to be there when you came out?
20  A  Exactly.
21  Q  What did he do then?
22  A  He got on his radio and he said, We got a
23  situation on AC, and he punched me -- and he started
24  punching me.

Page 27

1  Q  When you just testified to that you used
2  your right hand and made a gesture like you were
3  talking into a radio. Did he have his right hand on
4  his radio?
5  A  Yeah. He got right on his radio and said,
6  We got a situation over here on AC, and then he
7  followed up punching me.
8  Q  And where did he punch you?
9  A  In my face.
10  Q  With which hand did he punch you?
11  A  I don't know which hand. I just know I'm
12  getting punched.
13  Q  Other than what he said into the radio, did
14  he say anything to you before he punched you?
15  A  No. He just said -- I remember him saying,
16  He's refusing, and then he said, We got a situation
17  over here on AC, and he started punching me.
18  Q  He said, He's refusing?
19  A  Yeah.
20  Q  And then he said, We have a situation?
21  A  Yeah, but he didn't say that on the radio.
22  He didn't say he's refusing on the radio. He told
23  Pobbalino and the officers that's in the innerlock
24  right there, he told them, He's refusing. Then he

Page 28

1  got on the radio and said, We got a situation over
2  here on AC, and he started punching me.
3  Q  And the words you used, is that refusing,
4  like refusing to come out?
5  A  Yeah.
6  Q  At the time that he punched you, were there
7  any officers standing right immediately around him?
8  A  I mean, they start -- I told you, they was
9  on the deck right there. They was just right there
10  by the door, you know what I'm saying?
11  Q  Inside the innerlock or outside of it?
12  A  The door was open. They was on the
13  outside, though, with their gloves on, so they was
14  just waiting to come in.
15  Q  They were standing outside of the innerlock
16  door?
17  A  Yeah.
18  Q  Would that be inside the tier?
19  A  Like right there, the door right there.
20  They was like on the outside. Like this us, we on
21  the deck, they on the outside of the door, but the
22  door was open.
23  Q  So if we're on the deck and they're outside
24  the door, would that put them inside the innerlock

Page 33

1 put your arms up in front of your face -- in front
2 of your head, did Trejo continue to hit you?
3   A  Yes, sir.
4   Q  How did he do that? Did he get down on the
5 ground with you or how did he do that?
6   A  He was like this punching me, like trying
7 to move my arm from blocking my face. He was
8 hitting me like that.
9   Q  And when you just testified to that you
10 kind of stood up and you bent over at the waist
11 leaning down?
12   A  Yes, sir.
13   Q  Is that how he did it?
14   A  Yes, sir.
15   Q  So he was still on his feet?
16   A  Yes, sir.
17   Q  How many times did he hit you after you
18 were down?
19   A  I don't know, sir, because some other
20 officers, they came and they was like helping him.
21 By that time I was on my back and somebody had their
22 knee up in my back and I believe somebody elbow -- I
23 don't know if it was Trejo or one of the other
24 officers, they elbow was in my neck like this and

Page 34

1 somebody was hitting me, and I had went unconscious.
2   Q  You were down on the ground at that time?
3   A  Yes, sir.
4   Q  And then you went unconscious?
5   A  Yes, sir.
6   Q  When did you wake up conscious again?
7   A  I woke up -- I was like waking up, passing
8 out because the beating ain't stopped. I remember
9 that was inside the cell when I first went
10 unconscious. When we was outside the cell now, I
11 remember waking up, going back unconscious.
12   Q  So you were knocked unconscious inside the
13 cell?
14   A  Yeah.
15   Q  The last thing you remember while you were
16 still inside the cell down on the ground, did you
17 see any other officers besides Trejo inside the
18 cell?
19   A  I mean, I seen their feet. I couldn't see
20 their face.
21   Q  How many feet did you see?
22   A  A lot because they called all available.
23 You know, I had heard them call all available.
24   Q  Who called all available?

Page 35

1   A  I don't know. One of the officers.
2   Q  You heard somebody yell, All available?
3   A  All available.
4   Q  Where were you when you heard that?
5   A  I was on the floor.
6   Q  And then you said that when you regained
7 consciousness you were outside of the cell?
8   A  Yes, sir.
9   Q  Where located in the jail outside the cell?
10 Still in the day room?
11   A  In the day room.
12   Q  Were you on the upper or lower level?
13   A  Lower.
14   Q  Do you know how it was that you got from
15 being inside your cell to being outside the cell?
16   A  I mean, they took me out still getting down
17 on me.
18   Q  While you were unconscious?
19   A  Yes, sir.
20   Q  Do you know how it was that you got out of
21 your cell, how you physically got out of your cell?
22   A  They had to take me out of there, sir.
23 That's the only way I could have got out of there.
24   Q  How do you know that?

Page 36

1   A  I mean, if they would have left me in there
2 I would have just been still laying in there
3 bleeding, knocked out.
4   Q  Did you ever walk out of your cell?
5   A  No, sir.
6   Q  When you regained consciousness outside the
7 cell, you were on the lower level, you said?
8   A  Yes, sir.
9   Q  So all the way down the stairs?
10   A  Yes, sir.
11   Q  Was Trejo still there when you regained
12 consciousness downstairs?
13   A  I don't remember, sir.
14   Q  Before you got down the stairs, did you
15 ever punch Trejo?
16   A  No, sir.
17   Q  After Trejo first punched you when you were
18 back up in your cell, did you ever punch him?
19   A  No, sir.
20   Q  When you were on the ground in your cell,
21 did you ever punch him?
22   A  No, sir.
23   Q  At any time that day did you ever punch
24 Officer Trejo in the face?

Page 45

1  Q As far as you know, right?
2  A Yes, sir.
3  Q I wanted to go back just for a minute to
4  the day room when you regained consciousness when
5  you were in the cuffs and shackles.
6     Did you see any other inmates out there at
7  that time besides Lewis?
8  A No, sir.
9  Q Were you aware of anybody administering any
10 sort of medical care or examination to you in the
11 dispensary?
12 A Yes, sir.
13 Q You were aware of that?
14 A Yes, sir.
15 Q Do you know who that was?
16 A Yes. The same nurse I was telling you that
17 witnessed them kicking me.
18 Q So that was before you went unconscious the
19 third time?
20 A Yes, sir.
21 Q So did you go unconscious during the
22 examination?
23 A During the examination?
24 Q You said there was a nurse taking care of

Page 46

1  you or examining you in some way?
2  A Right.
3  Q What was she doing specifically, do you
4  remember?
5  A I mean, she just looked at me. She said I
6  got to go outside. When she walked off -- I mean,
7  she was still present, though, but she went behind
8  the counter. The officers was back there with me on
9  the other side of the counter with me still kicking
10 me, stepping all on me.
11 Q I guess what I'm trying to get at is, did
12 she actually do any sort of examination, like a
13 medical examination, take your temperature, your
14 pulse?
15 A I don't know. I can't really remember
16 that, but I remember her just looking at me, saying
17 I got to go outside, to an outside hospital.
18 Q This nurse, it was a female, right?
19 A Yes, sir.
20 Q What race was she?
21 A She was white.
22 Q Do you know what color hair she had?
23 A No, sir.
24 Q Can you describe her? Was she large,

Page 47

1  short, heavy?
2  A Older woman, short, fat, chubby.
3  Q I'm sure she'll be happy to hear that
4  description. I appreciate you're doing the best you
5  can.
6     Can you remember if she wore glasses or
7  anything like that?
8  A I can't remember.
9  Q Then you said she said she had to go out of
10 the room?
11 A Huh?
12 Q She said she had to go out of the room?
13 A No. She said I got to go outside.
14 Q What happened then?
15 A I mean, the officers, they was still
16 kicking me.
17 Q They were still kicking you?
18 A Yeah.
19 Q This is still in the dispensary?
20 A Yeah.
21 Q What's the next thing you remember?
22 A At the hospital, waking up at Mount Sinai
23 Hospital with lights all in my face, and the
24 Internal Affairs from Cook County had came and took

Page 48

1  pictures of me, asked me questions.
2  Q You remember there were investigators there
3  taking pictures of you?
4  A Yes, sir.
5  Q Do you remember going to Mount Sinai
6  Hospital? Do you remember the trip there?
7  A No, sir.
8  Q Were you conscious between the time you
9  said you fell unconscious the third time in the
10 dispensary and the time you were in Mount Sinai?
11 Were you conscious in --
12 A I just remember waking up in Mount Sinai.
13 Q How did you feel when you woke up in
14 Mount Sinai?
15 A I was messed up, man. I felt messed up.
16 Q I'm going to ask you, as best you can
17 remember, where specifically on your body did you
18 feel pain or messed up?
19 A My neck, my face, my jaw, my eye, my ears,
20 my legs, my back, my side --
21 Q Your face --
22 A -- my ankles.
23 Q Where specifically on your face, right
24 side, left side, nose, mouth, forehead?

Page 61

1 you first came into Cook County jail in 2002? Does
2 that sound familiar?
3   A  It's so long ago, I don't know. I
4 probably.
5   Q  But you do recognize that as your signature
6 next to the X?
7   A  Yes, sir.
8   Q  At some time, either in Mount Sinai
9 Hospital or when you got back, did you ever file an
10 inmate grievance against the officers that had beat
11 and kicked you?
12   A  Yeah. I had another inmate to write a
13 grievance for me.
14   Q  You had another inmate write it?
15   A  Yes, sir.
16     MR. FAHLGREN: Let's mark this No. 2
17     (Robertson Deposition Exhibit No. 2
18     was marked for identification.)
19 BY MR. FAHLGREN:
20   Q  I show you what's been marked Robertson
21 Deposition Exhibit No. 2 and ask you to take a look
22 at that. It's a two-page document, correct?
23   A  Yes, sir.
24   Q  Take a moment to look at it, and I'm going

Page 62

1 to ask you if you recognize it.
2   A  That's my signature.
3   Q  That's your signature?
4   A  Yes, sir.
5   Q  What do you recognize this document to be?
6 What is it?
7   A  A grievance.
8   Q  Does that appear to be a true and accurate
9 copy of the grievance that you filed about this
10 incident?
11     You can take a look at it and read it if
12 you need to.
13   A  Yeah, this is the grievance the inmate
14 wrote for me.
15   Q  It's your grievance but another inmate
16 actually wrote it out?
17   A  Yes, sir.
18   Q  Based on information you told him?
19   A  I mean --
20   Q  Did you ask that other inmate to write that
21 grievance for you?
22   A  Yes, sir.
23   Q  Is this the grievance that you sent -- that
24 you filed as a result of the incident with Officer

Page 63

1 Trejo?
2   A  Excuse me?
3   Q  Is this an accurate copy of the grievance
4 that you filed regarding the incident where you
5 claim that you were beaten and kicked?
6   A  Yes, sir.
7   Q  I want to ask you about in the upper
8 right-hand corner, it appears to have the date of
9 1/3/06. Do you see that?
10   A  Right.
11   Q  Do you know why the date says 1/3/06 when
12 it was written about a January 22nd incident?
13   A  I have no idea, sir.
14   Q  But if you look below that on the first
15 handwritten line right here, right below where it
16 says 1/3/06, it does say 22, January, right?
17   A  Yes, sir.
18   Q  That's the date of the incident that we're
19 talking about with the lawsuit, right, January 22nd?
20   A  Yes, sir.
21   Q  Now, I ask you to, first of all -- I'm
22 sorry. At the bottom of this first page there's the
23 printed words, Detainee Signature, and then a
24 signature next to that?

Page 64

1   A  Yes, sir.
2   Q  Is that your signature?
3   A  Yes, sir.
4   Q  You recognize that as your signature?
5   A  Yes, sir.
6   Q  Now take a look at the second page of
7 Exhibit 2.
8     Have you seen that second page before also?
9   A  That's my signature.
10   Q  Can you read that whole line for me in
11 front of your signature, all the letters?
12   A  I can't read cursive writing, sir.
13   Q  Let me ask you, take a look at it. The
14 second page around the middle, you see your
15 signature, right?
16   A  Yes, sir.
17   Q  And it says, Detainee Signature. That's
18 printed on the form in front of your signature,
19 right? Do you see that?
20   A  Yes, sir.
21   Q  In front of that, do you see there's a date
22 to the left of where it says, Detainee Signature?
23   A  Yeah.
24   Q  That says February 28, '06, right?

ROBERTSON vs. DART, et al.
Case: 1:07-cv-04398 Document #: 82-2 Filed: 01/28/09 Page 11 of 17 PageID #:278
Condenselt
DEPO OF S. ROBERTSON

Page 65

1 A Yes, sir.
2 Q And before that it indicates, Date detainee
3 received a response?
4 A Yeah.
5 Q Is it fair to say that your signature -- by
6 your signature you're indicating that you received a
7 response to the grievance? Is that what you were
8 signing about?
9 A Yes.
10 Q So you did receive the response that's
11 written as the top half of page 2, right?
12 A Yes.
13 Q I'm going to try to read this and you tell
14 me if you understand the response the same way I'm
15 reading it.
16 A Okay.
17 Q You see where it says, Response statement?
18 A Right.
19 Q Does that appear to say, Detainee was
20 aggressive and attacked CO?
21    Does that look like what it says to you?
22 A Yes.
23    MS. PAVICH: I think it was aggressor.
24

Page 66

1 BY MR. FAHLGREN:
2 Q Okay. Detainee was aggressor and attacked
3 CO. Is that accurate? Not accurate, but is that
4 what it says?
5 A Yes.
6 Q And then after that it says, Detainee
7 manipulated cell lock.
8    Do you see that?
9 A Yes, I see it.
10 Q There's something there, but it's hard to
11 read. It might be a T. After that do you see the
12 words, Charged accordingly?
13 A I remember getting this.
14 Q Did you read the response when you got it?
15 A I had somebody else read it to me.
16 Q And so you knew what the Department of
17 Corrections' response was --
18 A Right.
19 Q -- as a result of this document, right?
20 A Right.
21 Q Did you agree with that response?
22 A No.
23 Q Did you think it was right?
24 A No. I had thought I had appealed it

Page 67

1 because the counselor that had came to see me with
2 this -- I thought I had -- because I had another
3 inmate do another grievance for me too based on this
4 incident. I don't know what happened to it, though,
5 because the other inmate, he messed up on this
6 grievance he had done for me.
7 Q You had another inmate write a different
8 grievance than this one, right?
9 A Yes, sir.
10 Q But about the same incident?
11 A Yes, sir.
12 Q Have you ever seen a copy of that grievance
13 since then?
14 A No.
15 Q Just to finish with this one, looking at
16 the second page, is there anything written below
17 where it says your signature, any handwriting on
18 that form at all?
19 A Detainee Signature.
20 Q Below that.
21 A Oh, below that?
22 Q Yes. It's a blank form, right? Nobody
23 filled in any of those blanks, right?
24 A No.

Page 68

1 Q You didn't fill in any of those blanks, did
2 you?
3 A No.
4 Q Thank you. That's all I have on that.
5    As a result of this incident, were you
6 charged with a crime?
7 A Yes, sir.
8 Q And was that aggravated battery to Officer
9 Trejo? Is that what you understood the crime to be?
10 A Yes. Yes, sir.
11 Q Do you know what happened to that charge?
12 A They SOL'd it.
13 Q When was that?
14 A I believe July 23rd of last year.
15 Q Of '07?
16 A Yes, sir.
17 Q What happened on July 23rd of '07?
18 A I was being sentenced that day for the
19 crime that I was there charged with.
20 Q That was the murder charge?
21 A Yes, sir.
22 Q You were present for the sentencing
23 hearing --
24 A Yes, sir.

Part-A / Control #: 2006 X 0151

Referred To: I. A. D.

# COOK COUNTY DEPARTMENT OF CORRECTIONS
# DETAINEE GRIEVANCE

Detainee Last Name: Robertson           First Name: Shauntre

ID #: 2002 - 0020353   Div.: 11   Living Unit: AC   Date: 1/3/06

BRIEF SUMMARY OF THE COMPLAINT: On the 22 of January I had popped out my cell the officer Tyson caught me he came up the stairs arguing at me than he hit me an I defended myself an all of a sudden he steps back gets on the walkie talkie were arguing he kicks in the door an in comes all these officers than he pushes me than another officer he hits me than my cellie jumps off the top bunk an then the officers beat us drags us down the iron stairs cuffs us an thats all I remember than I woke up in Mt Sanai Hospital.

NAME OF STAFF OR DETAINEE(S) HAVING INFORMATION REGARDING THIS COMPLAINT:
Clyde Kendleton 200500391080  Andre Hains 2002002535

ACTION THAT YOU ARE REQUESTING:

DEPOSITION EXHIBIT
Robertson
5-16-08 CD

DETAINEE SIGNATURE: Shauntre Robertson

C.R.W.'S SIGNATURE: [signature]          DATE C.R.W. RECEIVED: 2/21/06

Please note: Decisions of the "Detainee Disciplinary Hearing Board" cannot be grieved or appealed through the use of a grievance form. All appeals must be made in writing and directly submitted to the Superintendent.

(WHITE COPY – PROG. SERV.)  (YELLOW COPY – C.R.W.)  (PINK COPY – DETAINEE)
00027

EXHIBIT A 2
(SAME AS EXH. B1)

Part. ID Control #: 2006 X 015

## C.C.D.O.C. DETAINEE GRIEVANCE / REFERRAL & RESPONSE

*EMERGENCY GRIEVANCES ARE THOSE INVOLVING AN IMMEDIATE THREAT TO THE WELFARE OR SAFETY OF A DETAINEE*

Detainee's Last Name: Robertson  First Name: Shaustee  ID#: 2002-0020353

Is This Grievance An Emergency? YES ☐  NO ☒

C.R.W.'S Summary Of The Complaint: Inmate claims that he was beated and pulled down the stairs.

C.R.W. Referred Griev. To: I.A.D.  Date Referred: 2/22/06

Response Statement: Detainee was agressive + attacked CO., detainee manipulated cell lock + charged accordingly, No I+D case file warranted.

Chief Kaufman  J/C?  Date: 2-27-06  Div./Dept: IAD
(print- name of individual responding to this griev.) (signature of individual responding to this griev.)

J. Anderson  #79  Date: 2/27/06  Div./Dept: XI
(print - name of Supt. / Designee / Dept. Admin.) (signature of Supt. Designee / Dept. Admin.)

C. Walton  Date: 2/28/06
(print - name of Prog. Serv. Admin / Asst. Admin.) (signature of Prog. Serv. Admin. / Asst. Admin.)

Date Detainee Received Response: 2/28/06  Detainee Signature: Shaustee Robertson

## REQUEST FOR AN APPEAL

*APPEALS MUST BE MADE WITHIN 14 DAYS OF THE DATE THE DETAINEE RECEIVED THE RESPONSE*

Date Detainee Request For An Appeal: ___/___/___

Detainee's Basis For An Appeal: _____

Appeal Board's Acceptance Of Detainee's Request:  YES ☐  NO ☐

Appeal Board's Reasoning / Decision / Recommendation To The Superintendent Or Administrator:

Appeal Board's Signatures / Dates:

Date Detainee Rec'd the Appl. Bd.'s Response: ___/___/___  Detainee Signature: _____

GRIEVANCE CODE(S): (___) (___) (___) (___)

ccsao

(WHITE COPY - PROG. SERV.) (YELLOW COPY - C.R.W.) (PINK COPY - DETAINEE) (GOLDENROD COPY - DIVISION/SUPT. OFFICE)

00028

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAUNTE ROBERTSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 07 C 4398 |
| v. ) | |
| ) | Judge Rebecca R. Pallmeyer |
| THOMAS DART, as SHERIFF OF COOK ) | |
| COUNTY, et al., ) | |
| ) | |
| Defendants. ) | |

# DEFENDANTS' EXHIBIT

# B

## Affidavit of Laroy Warren

## Affidavit of Laroy Warren

I, Laroy Warren, being duly sworn under oath, depose and state that the following is based upon firsthand knowledge, and I can testify to the following and that if I were called upon to testify, my testimony would be as follows:

1. My name is Laroy Warren and I am presently employed as Supervisor in the Program Services Office of the Cook County Department of Corrections at 2700 S. California in Chicago, Illinois. I was so employed in January 2006.

2. I am familiar with the detainee grievance procedure at CCDOC.

3. My duties include tracking grievances and maintaining grievance records, including responses and appeals filed by detainees.

4. The Cook County Department of Corrections (CCDOC) established a grievance procedure that is available to all inmates.

5. If the detainee wishes to appeal the grievance decision, the detainee will have fourteen working days from receipt of the response to appeal to the Administrator of Program Services by writing his reasons for appeal on the lower half of the response page for the grievance.

6. I have reviewed the attached Exhibit 1, a detainee Grievance filed by Shaunte Robertson with control number 2006X0151.

7. Mr. Robertson signed for receipt of the grievance response on February 28, 2006.

8. He did not fill in or sign the appeal section of the grievance.

9. I have reviewed the CCDOC Master Grievance log and database. There is no record of Mr. Robertson filing an appeal of this grievance response.

By: _____
Laroy Warren
Supervisor, Program Services
Cook County Department of Corrections

Subscribed and sworn to before me
this 22nd day of January, 2009

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
JOANNE KENNER
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 03/22/2009

EXHIBIT B

Part-A / Control # 2006 X 0151
Referred To: I.A.D.

# COOK COUNTY DEPARTMENT OF CORRECTIONS
# DETAINEE GRIEVANCE

Detainee Last Name: Robertson   First Name: Shauntae
ID #: 2002-0020353   Div.: 11   Living Unit: AC   Date: 1/3/06

BRIEF SUMMARY OF THE COMPLAINT: On the 22 of January I had popped out my cell the officer Tazio caught me he came up the stairs arguing at me than he hit me an I defended myself an all of a sudden he steps back gets on the walkie talkie were arguing he goes to the door an in comes all these officers than he pushes me than another officer he hits me than my cell? jumps off the top bunk an then the officers beat us drags us down the iron stairs cuffs us an thats all I remember than I woke up in Mt Sanai Hospital.

NAME OF STAFF OR DETAINEE(S) HAVING INFORMATION REGARDING THIS COMPLAINT:
Clyde Kendleton 20050063-1080   Andre Haines 20020025535

ACTION THAT YOU ARE REQUESTING:

DETAINEE SIGNATURE: Shaunta Robertson

C.R.W.'S SIGNATURE: [signature]   DATE C.R.W. RECEIVED: 2/21/06

DEPOSITION EXHIBIT
Robertson
5-16-08 CD

Please note: Decisions of the "Detainee Disciplinary Hearing Board" cannot be grieved or appealed through the use of a grievance form. All appeals must be made in writing and directly submitted to the Superintendent.

(WHITE COPY – PROG. SERV.)   (YELLOW COPY – C.R.W.)   (PINK COPY – DETAINEE)
00027

CCSAO
EXHIBIT B1 (SAME AS A2)

Part ID Control #: 2006 X 0151

## C.C.D.O.C. DETAINEE GRIEVANCE / REFERRAL & RESPONSE

*EMERGENCY GRIEVANCES ARE THOSE INVOLVING AN IMMEDIATE THREAT TO THE WELFARE OR SAFETY OF A DETAINEE*

Detainee's Last Name: Robertson First Name: Shauntae ID# 2002-0020353

Is This Grievance An Emergency? YES ☐ NO ☒

C.R.W.'S Summary Of The Complaint: Inmate claims that he was beaded and pulled down the stairs.

C.R.W. Referred Griev. To: I.A.D. Date Referred: 2/22/06

Response Statement: Detainee was aggressive + attacked C/O, detainee manipulated cell lock, + charged accordingly. No IAD case file warranted.

Chief Kaufman (print- name of individual responding to this griev.) (signature of individual responding to this griev.) Date: 2/23/06 Div./Dept. IAD

J. Anderson (print - name of Supt. / Designee / Dept. Admin.) (signature of Supt. / Designee / Dept. Admin.) Date: 2/21/06 Div./Dept. XI

C. Walroy (print - name of Prog. Serv. Admin. / Asst. Admin.) (signature of Prog. Serv. Admin. / Asst. Admin.) Date: 2/23/06

Date Detainee Received Response: 2/28/06 Detainee Signature: Shaunta Robertson

### REQUEST FOR AN APPEAL

*APPEALS MUST BE MADE WITHIN 14 DAYS OF THE DATE THE DETAINEE RECEIVED THE RESPONSE*

Date Detainee Request For An Appeal: ___/___/___

Detainee's Basis For An Appeal: _____

Appeal Board's Acceptance Of Detainee's Request: YES ☐ NO ☐

Appeal Board's Reasoning / Decision / Recommendation To The Superintendent Or Administrator:

Appeal Board's Signatures / Dates:

Date Detainee Rec.'d the Appl. Bd.'s Response: ___/___/___ Detainee Signature: _____

GRIEVANCE CODE(S): (___) (___) (___)

ccsao

(WHITE COPY - PROG. SERV.) (YELLOW COPY - C.R.W.) (PINK COPY - DETAINEE) (GREENGOLD COPY - DIVISION/SUPT. OFFICE)

00028